**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | | |
|---|---|---|
| AMERICAN ALTERNATIVE INSURANCE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 25-cv-00037-SAG |
| COMMERCIAL INSURANCE ASSOCIATES, LLC, SEAN P. KIRWAN, ROBIN V. RUSSELL, DONALD DENBO, SCOTT DENBO, and WILLIAM DENBO, | ) ) ) ) ) | |
| Defendants | ) | |

**<u>FIRST AMENDED COMPLAINT</u>**

Plaintiff, American Alternative Insurance Corporation ("AAIC"), by its undersigned attorneys, brings this First Amended Complaint against Defendants, Commercial Insurance Associates, LLC ("CIA"), Sean P. Kirwan ("Kirwan"), Robin V. Russell ("Russell"), Donald Denbo ("Don Denbo"), Scott Denbo, and William Denbo ("Will Denbo," and together with CIA, Kirwan, Russell, Don Denbo, and Scott Denbo, "Defendants"), and alleges as follows:

**<u>INTRODUCTION</u>**

1.     In this action, AAIC seeks to be made whole following Defendants' wide-ranging wrongful and fraudulent conduct that caused AAIC losses in excess of $1 million.

2.     AAIC is an insurance company that offers various lines of coverage in the commercial market. AAIC also issues surety bonds.

3.     CIA is a commercial insurance broker that deals in surety bonds.

4.     As part of the brokerage services it offers, CIA helps contractors obtain surety bonds (bond principals) and bond issuing companies (like AAIC) issue surety bonds.

1

5.     CIA works as an intermediary between the bond principal and bonding company that issues the surety bond.

6.     In its intermediary role, CIA gathers relevant information from the bond principal, transmits that information to the bonding company for review, obtains written approval from the bonding company to issue the surety bond (which is based upon the information provided by the bond principal), and coordinates the issuance of the surety bond.

7.     Bonding companies and surety brokers often enter into contracts called "producer agreements" to place parameters around and formalize their relationship.

8.     Here, AAIC entered into a producer agreement with CIA that authorized CIA to issue surety bonds to bond principals on behalf of AAIC, as long as CIA obtained AAIC's written approval before issuing each bond.

9.     As explained in more detail below, Defendants have breached the producer agreement and committed fraud and other tortious misconduct by, among other things, (1) issuing certain surety bonds without AAIC's approval, and (2) fabricating documents upon which AAIC relied in granting approval for the issuance of certain surety bonds.

10.    As a result of Defendants' wrongful acts, AAIC has been damaged in excess of $1 million and now seeks to be made whole.

**PARTIES**

11.    AAIC is a Delaware domiciled insurer with its principal place of business in Princeton, New Jersey.

12.    CIA is a Tennessee limited liability company, with its principal place of business located at 103 Powell Court, Suite 200, Brentwood, Tennessee.  Don Denbo, Scott Denbo, and Will Denbo (collectively, the "Denbo Defendants") are members of CIA.

2

13.     CIA also maintains an office located at 8601 Robert Fulton Drive, Suite 220, Columbia, Maryland 21046 and is registered to do business in the State of Maryland.

14.     CIA is an insurance producer licensed by the State of Maryland, License Number 182918.  Don Denbo is the Designated Responsible Licensed Producer for CIA as registered with the State of Maryland.  Don Denbo and Will Denbo are both designated by the State of Maryland as CIA Business Entity Affiliations.

15.     Upon information and belief, Don Denbo is a citizen of the state of Tennessee.  At all times relevant to this action, Don Denbo was the Executive Chairman and also a manager or managing member of CIA.

16.     Upon information and belief, Scott Denbo is a citizen of the state of Tennessee.  At all times relevant to this action, Scott Denbo was the Chief Executive Officer and also a manager or managing member of CIA.

17.     Upon information and belief, Will Denbo is a citizen of the state of Tennessee.  At all times relevant to this action, Will Denbo was the President and also a manager or managing member of CIA.

18.     Upon information and belief, Kirwan is a citizen of the state of Maryland and resides at 711 Morningside Drive, Towson, Maryland.

19.     At all times relevant to this action, Kirwan was an employee, officer, manager and/or member of CIA.

20.     Upon information and belief, Russell is a citizen of the state of Maryland and resides at 1211 La Grande Road, Silver Spring, Maryland.

21.     At all times relevant to this action, Russell was an employee of CIA.

22.      As top-level executives and managers of CIA, Don Denbo, Scott Denbo, and Will Denbo, at all relevant times, either directly or indirectly, supervised CIA employees, including Kirwan and Russell, in the State of Maryland.

## JURISDICTION AND VENUE

23.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different States.

24.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the claims and causes of action alleged herein arose in this District.

25.      This Court has personal jurisdiction over Kirwan and Russell under Md. Code Ann., Cts. & Jud. Proc. §6-102, which provides for personal jurisdiction over any person domiciled in the State of Maryland.

26.      This Court has personal jurisdiction over CIA under Md. Code Ann., Cts. & Jud. Proc. §6-103 (Maryland Long Arm Statute) because CIA transacted business and caused tortious injury in the State of Maryland.

27.      This Court has personal jurisdiction over each of the Denbo Defendants under Md. Code Ann., Cts. & Jud. Proc. §6-103 (Maryland Long Arm Statute), because as executives of CIA and Kirwan's and Russell's supervisors, they transacted business and caused tortious injury, either directly or through an agent, in the State of Maryland.

## FACTUAL BACKGROUND

### A.      The Producer Agreement and Amendment No. 1 to the Producer Agreement

28.      On or about May 13, 2022, AAIC and CIA entered into a Producer Agreement (the "Producer Agreement").

29.     Under the Producer Agreement, CIA was authorized to "receive and transmit to [AAIC] applications for contracts of insurance for single risk insurance business and to collect, receive, and record receipt of premiums in accordance with this Agreement."   Producer Agreement, ¶1.

30.     However, AAIC had the authority to accept or decline, at its sole discretion, any application submitted by CIA.  *Id*.  Indeed, the Producer Agreement specifically stated that "[a]t no time will CIA have the ability or right to bind coverage for or on behalf of [AAIC]."  *Id*.  In other words, CIA was required to submit all applications, inquiries, renewal requests, and endorsements to AAIC for consideration and approval.

31.     In exchange, CIA would earn a commission for each insurance policy sold, based upon a percentage of the insurance policy's premium. *Id.*, ¶3.

32.     The Producer Agreement also contains an indemnification provision, which reads as follows:

> [CIA] agrees to indemnify and to hold [AAIC] harmless against any liability, loss, damage, cost, fine, penalty, or expense that [AAIC] may sustain or incur directly or indirectly due to or arising out of any act or omission of [CIA] in conducting the business that is the subject of this Agreement, any act or omission by [CIA] in violation of this Agreement, resulting from any non-compliance with or breach of [CIA's] obligations under this Agreement, or resulting from [CIA's] failure to follow compensation disclosure laws and regulations.

33.     On or about May 13, 2022, the parties executed Amendment No. 1 to the Producer Agreement (the "Amendment," and together with the Producer Agreement, the "Agreement").

34.     The Amendment authorized CIA to issue surety bonds on behalf of AAIC and established a commission schedule for said surety business.  Amendment, ¶¶1-2.

35.     The Amendment also defined the specific circumstances under which CIA would be permitted to bind AAIC.  *Id*., ¶3.

36.     Paragraph 3 of the Amendment (which refers to CIA as "You") specifically provides as follows:

> The [Producer Agreement] is hereby amended to reflect the following changes with respect to the Surety business written on behalf of Company only:
>
> > a)     You may transmit underwriting information to Company. ***You are authorized to bind Company if and only if***:
> >
> > > i)     Prior to your binding each account or bond, Company has approved in writing that account or bond;
> > > ii)    You use only Company filed rates and authorized forms; and,
> > > iii)   The account has been handled in accordance with Company's underwriting guidelines.
> >
> > * * *
> >
> > d)     ***You may issue bonds when approved by Company to do so.*** You do not have authority to make, execute, seal and deliver bonds or undertakings that guarantee the payment or collection of any promissory note, check, draft or letter of credit under any circumstances.

*Id.* (emphasis added).

37.     CIA was not authorized to execute any surety bond on AAIC's behalf without AAIC's prior written authorization of the issuance of the specific bond.

**B.     AAIC's Procedures Regarding the Issuance of Surety Bonds**

38.     AAIC requires that all bond principals, and sometimes other individuals or entities, execute an indemnification agreement (a "General Agreement of Indemnity, or "GAI") in AAIC's favor before AAIC will authorize any bonds being executed on its behalf for a bond principal.

39.     The GAI provides, among other things, that the bond principal and the other signatories to the GAI (and sometimes certain other companies or individuals as may be required by AAIC) will indemnify AAIC for all losses, costs, and expenses that AAIC incurs as a result of having executed bonds on behalf of the bond principal.

40. AAIC will not authorize the execution of any bond for a bond principal without having received a properly executed GAI.

41. CIA and Kirwan had specific knowledge of AAIC's procedures regarding the issuance of surety bonds. Specifically, they knew that CIA could not execute a bond on behalf of AAIC without (i) a properly executed GAI, and (2) AAIC's written approval of the issuance of such a bond.

C.    **The Bonds at Issue**

42. In 2022, Concierge Business Solutions, Inc. ("CBS"), a Service-Disabled Veteran Owned Small Business Georgia contractor, contacted CIA seeking to obtain surety bonds in connection with certain construction projects for which CBS planned to submit bids or enter into contracts. At this point in time, CIA had already issued numerous surety bonds on behalf of AAIC.

1.    **The Lyons Project and Unauthorized Bonds**

43. One of the contracts on which CBS planned to bid or enter into was a contract with the United States (acting by and through its Department of Veterans Affairs (the "VA")) for a construction project known as Contract No. 36C24223C0042, Project No. 561A4-17-108, Replacement of Buildings 2, 4, 6, 7, 8, 9, and 57 Roofs at the VA New Jersey Healthcare System, Lyons Campus (the "Lyons Project").

44. In connection with CBS's request for surety bonds for the Lyons Project, CBS provided certain financial and project-level information to CIA, which CIA forwarded to AAIC, along with CIA's request for permission to execute surety bonds on behalf of AAIC to CBS for the Lyons Project.

45. In connection with CBS' request for AAIC to issue surety bonds to CBS for the Lyons Project (and other projects), on or about September 22, 2022, CBS, as well as individuals

Luis A. Montanez and Lydia A. Lebron, executed a General Agreement of Indemnity (the "CBS GAI") in favor of AAIC.

46. AAIC's surety underwriter Chris Anderson ("Anderson"), on behalf of AAIC, reviewed the request, but did not approve the issuance of any surety bonds to CBS for the Lyons Project. Anderson's primary concern regarding the Lyons Project centered around the unqualified roofing subcontractor that CBS had selected to complete the roofing work for the Lyons Project.

47. In a December 2022 telephone call to Kirwan, Anderson expressed AAIC's concerns about the Lyons Project and the unqualified roofing subcontractor, and expressly communicated to CIA that CIA was not authorized to issue any surety bonds to CBS for the Lyons Project on behalf of AAIC.

48. In that same telephone call, Anderson explained to Kirwan that he had done an initial investigation into the roofing subcontractor and discovered that the company was on the verge of bankruptcy.

49. Kirwan expressed his appreciation for the information and represented that CIA would work with its client to try to find another roofing subcontractor for the Lyons Project. He communicated to Anderson that he and CIA would not issue any surety bonds to CBS without first obtaining AAIC's written approval.

50. Anderson represented that AAIC was not willing to approve surety bonds for the Lyons Project based on the information provided. Neither CIA nor Kirwan followed up with CIA or Anderson about issuing surety bonds for the Lyons Project after the December 2022 telephone call where Anderson represented that AAIC would not approve the issuance of any bonds for the Lyons Project.

51.     Based upon the December 2022 telephone conversation, and other communications with Kirwan, Anderson and AAIC relied on Kirwan and CIA's, representation that CIA would not issue any surety bonds in connection with the Lyons Project without first obtaining AAIC's written approval.

52.     At no point did AAIC approve the issuance of surety bonds to CBS for the Lyons Project, either in writing or otherwise.

53.     Kirwan knew that AAIC had not approved and would not approve the issuance of any surety bonds to CBS for the Lyons Project based on the information Kirwan had provided. Kirwan also knew that AAIC relied or would rely on his representation that he would not issue surety bonds to CBS based on the information provided.

54.     Despite knowing that AAIC had not and would not approve the issuance of any surety bonds to CBS for the Lyons Project, on or about December 1, 2022, Kirwan, in his capacity as an employee, officer, manager and/or member of CIA, executed, as attorney-in-fact for AAIC, both a performance bond and a payment bond in AAIC's name to CBS for the Lyons Project, both bonds bearing Bond No. S7A2SU0000562 and each in the penal sum of $4,642,542.20, with AAIC as Surety, CBS as Principal, and the United States as Obligee (the bonds together being the "Lyons Bonds").

55.     CIA and Kirwan did not obtain AAIC's approval for the issuance of the Lyons Bonds prior to issuing them, even though the Agreement expressly provides that before issuing a surety bond that binds AAIC, AAIC was required to approve the issuance in writing.

56.     Neither CIA nor Kirwan were authorized to issue and execute the Lyons Bonds on behalf of AAIC.

57.     Knowing that AAIC had not approved the issuance of the bonds, neither CIA nor Kirwan informed AAIC that CIA had issued the Lyons Bonds.

58.     By January 2, 2024, AAIC was aware of the wrongful issuance of the Lyons Bonds when it was notified that claims had been brought against the Lyons Bonds by subcontractors and suppliers that CBS and/or CBS' subcontractors failed to pay.

59.     On January 3, 2024, AAIC advised CIA via email that it had not approved the issuance of the Lyons Bonds and had, in fact, affirmatively declined to approve the issuance of any bonds to CBS for the Lyons Project.

60.     CIA did not dispute that the Lyons Bonds were issued without AAIC's written approval, in violation of the Agreement.

61.     By June 2024, CBS notified AAIC that it would not be able to complete the Lyons Project and that it was unable to pay various contractors and suppliers for work performed and supplies provided in connection with the Lyons Project.

62.     Numerous claims have been made under the payment bond issued for the Lyons Project in connection with work performed on the that project.

63.     On August 6, 2024, the VA declared CBS in default of the Lyons Project contract, terminated that contract, and has since made a claim against AAIC under the performance bond issued for the Lyons Project.

64.     AAIC has incurred losses in excess of $75,000 as surety for CBS under the Lyons Bonds, which losses are expected to increase as a result of other still-pending claims under the Lyons Bonds.

65.     AAIC would not have incurred such losses had CIA and Kirwan not issued and executed the Lyons Bonds, which CIA and Kirwan executed in AAIC's name in violation of the Agreement.

### 2.     The Martinsburg Project and Improperly Issued Bonds

66.     CIA and Kirwan also asked AAIC to provide CBS with surety bonds for a construction project for the VA known as Contract No. 36C24522C0104, Renovate/Expand 47-Bed Domiciliary C Pod and Replace Air Handling Units project at the VAMC facility in Martinsburg, West Virginia (the "Martinsburg Project").

67.     In connection with CBS's request for surety bonds for the Martinsburg Project, CBS provided certain financial and project-level information to CIA, which CIA forwarded to AAIC, along with CIA's request for permission to execute surety bonds on behalf of AAIC to CBS for the Martinsburg Project.

68.     CIA and Kirwan knew that AAIC would reasonably rely upon the information provided in determining whether or not AAIC would issue surety bonds for CBS for the Martinsburg Project.

69.     After reviewing the information CIA provided regarding the Martinsburg Project, AAIC specified that, in addition to the CBS GAI, AAIC required additional protection in the form of indemnity from a particular subcontractor for the Martinsburg Project before issuing any bond. Specifically, AAIC required that JFDB, LTD d/b/a Feldkamp Design Build ("Feldkamp"), the "super subcontractor" for the Martinsburg Project and its principals execute a GAI before AAIC would approve any bonds.

70.     Anderson communicated directly to Kirwan AAIC's requirement for the Feldkamp GAI during a March 2023 telephone call.  Anderson made clear that AAIC would not authorize

the issuance of any surety bonds for the Martinsburg Project without additional indemnification protection from Feldkamp and its principals.

71.     On that phone call, Kirwan stated that he understood AAIC's requirement and did not express any concern regarding CIA's ability to secure a GAI from Feldkamp and its principals.

72.     CIA and Kirwan knew of AAIC's requirement with respect to the need for the additional indemnification protection.

73.     CIA and Kirwan knew that AAIC would not authorize issuance of any surety bonds to CBS for the Martinsburg Project without receiving the additional indemnification protection.

74.     CIA and Kirwan represented to AAIC that Feldkamp and its principals would provide the guarantee.

75.     On or about April 21, 2023, CIA and Kirwan provided AAIC with a "Project Specific Amendment Adding Indemnitors to General Agreement of Indemnity" purportedly executed by Feldkamp, as well as Jonathan Feldkamp, Joel Feldkamp and Jody Feldkamp (the "Feldkamp GAI Amendment"), whereby the purported signatories (the "Purported Feldkamp Indemnitors") thereto would be bound by the CBS GAI for the Martinsburg Project.

76.     In his email, Kirwan represented the authenticity of the Feldkamp GAI Amendment:



77.    Each of the signatures of the Purported Feldkamp Indemnitors to the Feldkamp GAI Amendment were acknowledged by Russell, who AAIC understands was, at the time, a Bond Client Manager at CIA working under Kirwan's supervision and a licensed notary in the state of Maryland.

78.    Each of the acknowledgements notarized and signed by Russell on the Feldkamp GAI Amendment state that the Purported Feldkamp Indemnitors personally came before Russell to execute the Feldkamp GAI Amendment.

79.    Anderson and AAIC relied upon Kirwan and CIA's representation that the Feldkamp GAI Amendment had in fact been signed by Jonathan Feldkamp, Joel Feldkamp and Jody Feldkamp and that the document was valid and binding.

80.    In reliance on the Feldkamp GAI Amendment, Anderson, on behalf of AAIC, authorized the issuance of surety bonds to CBS for the Martinsburg Project.

81.    AAIC would not have authorized CIA to issue any surety bonds to CBS for the Martinsburg Project had it known that the Proposed Feldkamp Indemnitors had not, in fact, signed the Feldkamp GAI Amendment.

82.    Given the March 2023 telephone call between Anderson and Kirwan, CIA and Kirwan knew that AAIC would not have authorized CIA to issue any surety bonds to CBS for the

Martinsburg Project if AAIC had known that the Purported Feldkamp Indemnitors had not, in fact, signed the Feldkamp GAI Amendment.

83.    On or about May 9, 2023, Kirwan, in his capacity as an employee, officer, manager and/or member of CIA, executed, as attorney-in-fact for AAIC, both a performance bond and a payment bond in AAIC's name to CBS for the Martinsburg Project, both bonds bearing Bond No. S7A2SU0001360 and each in the penal sum of $7,000,000.00, naming AAIC as Surety, CBS as Principal, and the United States as Obligee (the bonds together being the "Martinsburg Bonds").

84.    By July 2024, CBS notified AAIC that it would not be able to complete the Martinsburg Project and that it was unable to pay various contractors and suppliers for work performed and supplies provided in connection with that project.

85.    Numerous claims and lawsuits have been made under the payment bond issued for the Martinsburg Project due to CBS' failure to pay subcontractors and suppliers for work performed on the Martinsburg Project (the "Martinsburg Payment Bond Claims").

86.    On July 22, 2024, the VA declared CBS in default of the Martinsburg Project contract, terminated that contract, and has since made a claim against AAIC under the performance bond issued for the Martinsburg Project (the "Martinsburg Performance Bond Claim" and, together with the Martinsburg Payment Bond Claims, the "Martinsburg Bond Claims").

87.    Upon receiving the Martinsburg Bond Claims, AAIC contacted the Purported Feldkamp Indemnitors to advise them of their indemnity obligations under the Feldkamp GAI Amendment relative to the Martinsburg Bonds.

88.    On or about May 6, 2024, the Purported Feldkamp Indemnitors responded through counsel, questioned the authenticity of the Feldkamp GAI Amendment, and asserted that none of the Purported Feldkamp Indemnitors had signed the documents and that their signatures were

forgeries.  Further, the Purported Feldkamp Indemnitors stated that they were in Ohio, not Maryland on the day that the Feldkamp GAI Amendment was purportedly executed and notarized in Maryland.

89.    On or about May 20, 2024, AAIC contacted CIA regarding the execution of the Feldkamp GAI Amendment by the Proposed Feldkamp Indemnitors.

90.    CIA advised AAIC that the Feldkamp GAI Amendment was not executed before Russell personally.

91.    CIA advised AAIC that the Feldkamp GAI Amendment was signed by the Proposed Feldkamp Indemnitors and then mailed to CIA, and was subsequently notarized by Russell outside the presence of the Proposed Feldkamp Indemnitors.

92.    CIA has produced no evidence to demonstrate that the Proposed Feldkamp Indemnitors actually signed the Feldkamp GAI Amendment.

93.    CIA has not disputed the Proposed Feldkamp Indemnitors' claim that they did not sign the Feldkamp GAI Amendment, nor otherwise contested the Proposed Feldkamp Indemnitors' position that they have no contractual duty to indemnify AAIC for losses sustained as a result of the issuance of the Martinsburg Bonds.

94.    When CIA and Kirwan made the representation that the Proposed Feldkamp Indemnitors had executed the Feldkamp GAI Amendment, CIA and Kirwan knew that such representation was false when made or the representation was made recklessly and without regard for the truth.

95.    When Kirwan forwarded the Feldkamp GAI Amendment to AAIC containing signatures of the Proposed Feldkamp Indemnitors, purportedly witnessed and notarized by Russell, he knew that the identities of the individuals signing the Feldkamp GAI Amendment were not

confirmed by Russell, and that the Proposed Feldkamp Indemnitors had not appeared before Russell to acknowledge execution of the Feldkamp GAI Amendment.

96.     When Kirwan represented to AAIC that the Feldkamp GAI Amendment was properly executed by the Feldkamp Indemnitors and that AAIC could rely on the Feldkamp GAI Amendment in connection with AAIC's decision to approve the bonds for CBS for the Martinsburg Project, Kirwan knew that such representation was false when made.

97.     Moreover, based on his communications with Anderson, Kirwan knew that AAIC would rely on the validity of the Feldkamp GAI Amendment in determining whether to approve the Martinsburg Bonds.

98.     As a result of CIA's and Kirwan's intentional and/or negligent misrepresentations relating to the authenticity of the Feldkamp GAI Amendment, AAIC has been deprived of the security upon which it based its approval of the issuance of the Martinsburg Bonds.

99.     To date, AAIC has incurred losses in excess of $1 million as a result of Defendants' wrongful conduct.  AAIC's losses are continuing.

## COUNT I
## BREACH OF CONTRACT – LYONS BONDS
## AGAINST CIA

100.    AAIC hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

101.    The Agreement is an enforceable contract, binding CIA and AAIC.

102.    AAIC performed all of its obligations under the Agreement.

103.    At all relevant times, Kirwan was an agent of CIA acting on CIA's behalf.

104.    CIA's execution and issuance of the Lyons Bonds without the written authorization of AAIC was a breach of the Agreement.

105.    AAIC has sustained and will continue to sustain substantial damages as a result of CIA's issuance of the Lyons Bonds in breach of the Agreement.

106.    Pursuant to the Agreement, CIA is obligated to indemnify and hold AAIC harmless from all liability, loss, damage, cost, fine, penalty, or expense that AAIC may sustain or incur directly or indirectly due to or arising out of the issuance of the Lyons Bonds.

**COUNT II**
**BREACH OF CONTRACT – MARTINSBURG BONDS**
**AGAINST CIA**

107.    AAIC hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

108.    The Agreement is an enforceable contract, binding CIA and AAIC.

109.    AAIC performed all of its obligations under the Agreement.

110.    At all relevant times, Kirwan was an agent of CIA acting on CIA's behalf.

111.    CIA breached the Agreement by inducing AAIC's authorization to issue the Martinsburg Bonds by providing a fabricated document, the Feldkamp GAI Amendment, to AAIC.

112.    AAIC has sustained and will continue to sustain substantial damages as a result of CIA's issuance of the Martinsburg Bonds in breach of the Agreement.

113.    Pursuant to the Agreement, CIA is obligated to indemnify and hold AAIC harmless from all liability, loss, damage, cost, fine, penalty, or expense that AAIC may sustain or incur directly or indirectly due to or arising out of the issuance of the Martinsburg Bonds.

**COUNT III**
**PROFESSIONAL NEGLIGENCE**
**AGAINST CIA AND KIRWAN**

114.    AAIC hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

115.    CIA and Kirwan owed a duty to conform to a certain standard of care for the protection of AAIC.

116.    At all relevant times, Kirwan was an agent of CIA acting on CIA's behalf.

117.    CIA and Kirwan breached their duties when Kirwan, acting as an agent of CIA, issued the Lyons Bonds without first obtaining AAIC's written consent to do so.

118.    CIA and Kirwan further breached their duties when Kirwan, acting as an agent of CIA, failed to obtain a genuine and properly executed Feldkamp GAI Amendment from the Proposed Feldkamp Indemnitors prior to AAIC approving, and CIA issuing, the Martinsburg Bonds.

119.    As a direct result of CIA's and Kirwan's negligence, AAIC has sustained damages for which CIA and Kirwan are liable.

120.    AAIC's damages proximately resulted from CIA's and Kirwan's breach of their duties to AAIC.

### COUNT IV
### NEGLIGENT MISREPRESENTATION
### AGAINST CIA AND KIRWAN

121.    AAIC hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

122.    CIA owed a duty of care to AAIC.

123.    Kirwan, who had attorney-in-fact power for AAIC to execute surety bonds in AAIC's name once such bonds were approved by AAIC, owed a duty of care to AAIC.

124.    In March 2023, CIA and Kirwan negligently made a false statement when they informed AAIC, through Anderson, that CIA had obtained a genuine and properly executed Feldkamp GAI Amendment bearing all signatures of the Proposed Feldkamp Indemnitors.

125.    CIA and Kirwan knew that the Feldkamp GAI Amendment was not genuine and was not properly executed and notarized.

126.    CIA and Kirwan intended AAIC to act and rely upon CIA's negligent misrepresentation.

127.    CIA and Kirwan knew that AAIC would rely on the negligent assertion which, if untrue, would cause AAIC to sustain damage.

128.    AAIC justifiably relied on CIA's and Kirwan's representation that the Proposed Feldkamp Indemnitors had executed the Feldkamp GAI Amendment and, to AAIC's detriment, authorized the issuance of the Martinsburg Bonds.

129.    As a result of CIA's and Kirwan's misrepresentations, AAIC has sustained substantial damages for which CIA and Kirwan are liable.

**COUNT V**
**FRAUD**
**AGAINST CIA AND KIRWAN**

130.    AAIC hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

131.    CIA and Kirwan committed fraud when they issued the Lyons Bonds without the written authorization of AAIC, despite their knowledge that AAIC, through Anderson, had affirmatively declined to approve the issuance of any bonds to CBS for the Lyons Project.

132.    Given the December 2022 telephone conversation between Anderson and Kirwan where Anderson expressly stated that AAIC would not authorize any surety bonds in connection with the Lyons Project, CIA and Kirwan unequivocally knew that AAIC had not approved the issuance of the Lyons Bonds and that any representation to the contrary was false.

133.    CIA and Kirwan knew that they could not issue any bonds without AAIC's written approval, and that their representations that the Lyons Bonds were duly authorized (including by issuing the Lyons Bonds) was false.

134.    CIA and Kirwan made the false representation regarding AAIC's approval of the issuance of the Lyons Bonds, and in fact issued the Lyons Bonds, for the purpose of defrauding AAIC and to benefit themselves.

135.    AAIC justifiably relied upon CIA and Kirwan to follow AAIC's express instructions not to issue any bonds to CBS for the Lyons Project and relied upon CIA's and Kirwan's representations that they would not issue any bonds without AAIC's written approval.

136.    But for CIA's and Kirwan's wrongful issuance of the Lyons Bonds without AAIC's written approval, AAIC would not have issued the Lyons Bonds.

137.    CIA and Kirwan also committed fraud when they falsely informed AAIC that they had obtained the fully executed and notarized Feldkamp GAI Amendment bearing all signatures of the Proposed Feldkamp Indemnitors.

138.    CIA and Kirwan committed fraud when, in March 2023, they delivered the executed Feldkamp GAI Amendment, unlawfully acknowledged and notarized by Russell (a CIA employee), even though CIA and Kirwan knew that the Feldkamp GAI Amendment was not acknowledged before Russell by any of the signatories thereto.

139.    CIA and Kirwan knew that the representation was false.

140.    CIA and Kirwan made the false representation for the purpose of defrauding AAIC and to benefit themselves.

141.    CIA and Kirwan's actions were willful and malicious because they knew that AAIC had not approved the Lyons Bonds and required the Feldkamp GAI Amendment in order to issue the Martinsburg Bonds, but CIA and Kirwan issued both sets of bonds anyway.

142.    AAIC justifiably relied upon the misrepresentation made by CIA and Kirwan that the Feldkamp GAI Amendment had been actually signed by the Proposed Feldkamp Indemnitors and acknowledged by Russell.

143.    But for CIA's and Kirwan's misrepresentation regarding the Feldkamp GAI Amendment, AAIC would not have authorized the issuance of the Martinsburg Bonds.

144.    As a direct result of AAIC's reliance upon CIA's and Kirwan's misrepresentations, AAIC has sustained substantial damages for which CIA and Kirwan are liable.

**COUNT VI**
**FRAUD**
**AGAINST RUSSELL**

145.    AAIC hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

146.    Russell unlawfully acknowledged and notarized the Feldkamp GIA Amendment in the course of her duties as an employee of CIA.

147.    Russell committed fraud in providing a notarized acknowledgment of the Proposed Feldkamp Indemnitors to the Feldkamp GIA Amendment because the Proposed Feldkamp Indemnitors never appeared before Russell to acknowledge their signatures to the Feldkamp GIA Amendment.

148.    Russell knew that the Proposed Feldkamp Indemnitors never appeared before Russell to acknowledge their signatures to the Feldkamp GIA Amendment.

149.     Russell knew that AAIC would rely upon her execution of notarized acknowledgments that the Proposed Feldkamp Indemnitors had executed the Feldkamp GIA Amendment.

150.     Russell acknowledged and notarized the Feldkamp GIA Amendment in order to defraud AAIC and benefit herself and CIA.

151.     AAIC justifiably relied upon the misrepresentation made by Russell that the Feldkamp GAI Amendment has been actually signed by the Proposed Feldkamp Indemnitors.

152.     But for Russell's misrepresentation regarding the proper execution and notarization of the Feldkamp GAI Amendment, AAIC would not have authorized the issuance of the Martinsburg Bonds.

153.     As a direct result of AAIC's reliance upon Russell's misrepresentation, AAIC has sustained substantial damages for which Russell is liable.

<u>**COUNT VII**</u>
**NEGLIGENT SUPERVISION**
**AGAINST CIA, DON DENBO, SCOTT DENBO, WILL DENBO**

154.     AAIC hereby repeats, realleges, and incorporates each of the foregoing allegations as if set forth fully herein.

155.     At all relevant times, Kirwan and Russell were both employed by CIA.

At all relevant times, Kirwan and Russell both resided and were employed by CIA in the State of Maryland.

156.     At all relevant times, Kirwan and Russell both reported, directly or indirectly, to Don Denbo, Scott Denbo, and Will Denbo, as CIA's supervising executives.

157.    As Kirwan and Russell both resided and worked in the State of Maryland, CIA, Don Denbo, Scott Denbo, and Will Denbo supervised Kirwan and Russell's activity as CIA employees in the State of Maryland.

158.    CIA, Don Denbo, Scott Denbo, and Will Denbo had a duty to supervise Kirwan and Russell in the performance of their duties as CIA employees.

159.    CIA, Don Denbo, Scott Denbo, and Will Denbo failed to properly and adequately supervise Kirwan and Russell, including by failing to implement protective measures sufficient to prevent employees from taking the kinds of improper actions that Kirwan and Russell took with respect to the issuance of the Lyons Bonds, the Martinsburg Bonds, and the execution of the Feldkamp GAI Amendment.

160.    CIA, Don Denbo, Scott Denbo, and Will Denbo knew or should have known of Kirwan and Russell's improper conduct in connection with the issuance of the Lyons Bonds, the Martinsburg Bonds, and the execution of the Feldkamp GAI Amendment.

161.    AAIC was substantially injured by Kirwan and Russell's improper conduct.

162.    CIA, Don Denbo, Scott Denbo, and Will Denbo's failure to adequately supervise Kirwan and Russell, and their failure to implement sufficient protective measures to protect AAIC from Kirwan and Russell's improper conduct, caused substantial injury to AAIC.

WHEREFORE, AAIC demands judgment against CIA, Kirwan, Russell, Don Denbo, Scott Denbo, and Will Denbo for compensatory damages, punitive damages, costs of suit, attorney's fees, and such other and further relief as the Court deems just and proper.

Dated:  April 15, 2025                    Respectfully submitted,


                                          */s/ Mary C. Zinsner*
                                          Mary C. Zinsner, MD Bar # 11763
                                          Troutman Pepper Locke LLP
                                          401 9th Street, NW, Suite 1000
                                          Washington, DC 20004
                                          Tel:  202.274.1932
                                          Fax:  202.274.2994
                                          E-mail:  mary.zinsner@troutman.com

                                          James H.S. Levine
                                          *Pro Hac Vice* To Be Submitted
                                          Troutman Pepper Locke LLP
                                          Hercules Plaza, Suite 1000
                                          1313 Market Street, PO Box 1709
                                          Wilmington, DE 19800
                                          Tel:  302.777.6500
                                          Fax:  302.421.8390
                                          E-mail: james.levine@troutman.com

                                          Emily L. Wheatley
                                          *Pro Hac Vice* To Be Submitted
                                          Troutman Pepper Locke LLP
                                          Hercules Plaza, Suite 1000
                                          1313 Market Street, PO Box 1709
                                          Wilmington, DE 19800
                                          Tel:  302.777.6574
                                          Fax:  302.421.8390
                                          E-mail: emily.wheatley@troutman.com

                                          *Counsel for Plaintiff*